UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,          )
                                   )   CRIMINAL ACTION NO.
                                   )   14-CR-10191-DPW
v.                                 )
                                   )
JOSEPH KENNEDY,                    )
                                   )
        Defendant.                 )

MEMORANDUM
July 30, 2015

Joseph Kennedy moved to suppress physical evidence —
ammunition — seized from a car he was operating immediately
before his May 7, 2014 arrest on a supervised release warrant
and some twelve hours after a larceny there was probable cause
to believe he committed.  I conducted an evidentiary hearing to
determine the circumstances surrounding the recovery of this
evidence.  I denied Kennedy's motion to suppress, concluding
that there was probable cause to believe the car contained
evidence of the larceny offense and that the car itself was an
instrumentality of the offense.  This Memorandum provides an
extended explanation for my decision.

## I. FINDINGS OF FACT

In the spring of 2014, Kennedy was on federal supervised
release.  A warrant had been issued for Kennedy's arrest due to

a violation of the terms of his supervision.  The United States Marshals Service and the Fugitive Unit of the Boston Police Department (BPD) were conducting surveillance on May 7, 2014 in an effort to arrest Kennedy on the outstanding warrant.  They were stationed near 34 O'Meara Court in Charlestown, Massachusetts, where Kennedy had been living with Maureen Burgoyne, his longtime partner.

Earlier that same day, the Quincy Police Department put out a "Be on the Lookout" notification ("BOLO") for Kennedy, which was conveyed orally to the BPD officers.  Sergeant Brian Albert testified at the suppression hearing that the BPD officers were informed "that there was a larceny in Quincy in which a safe with some ammunition, possibly some drugs, OC spray, pepper spray, and things of that nature were stolen from a residence in Quincy."  The BOLO from the Quincy Police specifically identified Joseph Kennedy as its subject and also provided a description of the car that Kennedy was expected to be driving, a gray Honda Fit with license plate number 155WS3.

At approximately 3:00 p.m., the BPD officers received a radio report that a gray Honda Fit with Massachusetts license plate number 155WS3 was turning onto Medford Street.  Kennedy was identified as the operator of the vehicle based on photographs provided by a United States Marshals Service earlier in the day.  Kennedy parked the car and was walking on Medford

Street when officers approached him.  After a brief chase,
officers apprehended Kennedy and arrested him on the outstanding
federal warrant.  Kennedy was taken to the District One station
of the BPD to be booked.

After Kennedy's arrest, the remaining officers returned to
the car.  Sergeant Albert testified that there was a lot of
clutter and debris in the car.  He saw an object sitting high in
the back seat, with items including bags and a jacket on top of
and around it.  Sergeant Albert testified that it "gave the
appearance of a box-shaped object" and that he could see a small
section of gray.  Two photographs of the object, which turned
out to be the gun safe, were admitted at the hearing.  The
photographs were taken with the back car door open, and one
showed a dark bag covering the top of the object and the other
showed the safe after the bag had been removed.  Sergeant Albert
testified that the safe had even more items around it than
depicted in the photographs before the door was opened and
suggested that some items may have shifted during the movement
of the door.  He testified he believed the covered object was
the stolen gun safe based on the earlier communication from the
Quincy Police Department about Kennedy's larceny of a gun safe,
the shape and size of the object, and the small amount of
metallic-looking gray that he saw.  There was no photograph

taken of the item that later turned out to be the safe from before the door of the car was opened.

Based on Sergeant Albert's testimony at the hearing, I find that the gun safe cannot be said to have been in plain view. Instead, its semi-concealed appearance provided circumstantial evidence that the box-shaped object Sergeant Albert observed sitting high on the back seat was the gun safe.  It was covered almost completely, except for a small section of gray, by a bag and other debris.  The size, general shape, and color were consistent with Sergeant Albert's understanding of what a gun safe looks like, but the safe itself could not be seen. Sergeant Albert's report of his observation of the covered object contributes to my finding, discussed more fully below, that there was probable cause to believe the car contained evidence of the Quincy larceny.

Sergeant Albert decided to tow the vehicle and the officers conducted a search on the street, which Sergeant Albert referred to as an inventory search.  He testified that the car needed to be towed because "I believe that there was possible evidence to a crime in the car.  The vehicle itself could be evidence to a crime as the getaway vehicle.  There could be ammunition and firearms in that vehicle, which would cause a danger to the public."

Maureen Burgoyne came to the area while the car was being inventoried and offered to take custody of the car, which the officers refused.  During the search, the officers recovered a gray safe matching the description of the safe stolen from Quincy and rounds of ammunition, among other items.  The car was towed to the precinct, after which the inventoried items were categorized and noted in an inventory report.  Kennedy was subsequently indicted for being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1).

## II. ANALYSIS

### A.   *Standing*

I begin by finding as a foundation for my motion to dismiss analysis that Kennedy has standing to claim the Fourth Amendment's protection from unreasonable searches.  Although he did not own the car, he had a reasonable expectation of privacy in it.  "In the context of a vehicle search, a defendant must show 'a property [or] possessory interest in the automobile' in order to establish a reasonable expectation of privacy."  *United States* v. *Almeida*, 748 F.3d 41, 47 (1st Cir. 2014)(quoting *United States* v. *Symonevich*, 688 F.3d 12, 19 (1st Cir. 2012)). The government does not contest Kennedy's standing for purposes of this motion, although I believe it is necessary independently to determine Kennedy's standing before turning to the merits of his motion to dismiss.

Kennedy was not the title holder of the car; the car was owned by Kennedy's partner Burgoyne.  She submitted an affidavit that was received as testimony during the hearing affirming that he was a frequent, authorized user of the car.  The car contained his personal effects, and he had been in sole possession of the car for at least two days with the title holder's permission.  Kennedy's status as a frequent authorized user of the car and his sole use of the car during the period of time before the arrest are among the factors on which I rely in concluding that Kennedy had a reasonable expectation of privacy in the car and that he therefore has standing to pursue his motion to suppress.

**B.    Probable Cause to Seize and Search the Car**

Under the automobile exception to the warrant requirement, "the only essential predicate for a valid warrantless search of a motor vehicle by law enforcement officers is probable cause to believe that the vehicle contains contraband or other evidence of criminal activity."  *United States* v. *McCoy*, 977 F.2d 706, 710 (1st Cir. 1992).  Probable cause exists when the facts available to a police officer would "warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present."  *Florida* v. *Harris*, 133 S.Ct. 1050, 1055 (2013) (quoting *Texas* v. *Brown*, 460 U.S. 730, 742 (1983)).  This

is a "practical and common-sensical standard," relying on the totality of the circumstances. *Id.*

Given the report from the larceny victim to the Quincy Police Department later conveyed to the arresting officers, the officers had probable cause to arrest Kennedy on the new larceny charge as well as on the outstanding warrant. *Acosta* v. *Ames Dep't Stores, Inc.*, 386 F.3d 5, 10 (1st Cir. 2004)(even "[t]he uncorroborated testimony of a victim or other percipient witness, standing alone, ordinarily can support a finding of probable cause.")

However, the question whether the officers could search the car does not depend on the officers' ability to arrest Kennedy — Kennedy was arrested after leaving the car, so this was not a search incident to arrest. *Arizona* v. *Gant*, 556 U.S. 332 (2009). Rather, the question is whether they had probable cause to believe that there was evidence of the crime in the car. *See United States* v. *Polanco*, 634 F.3d 39, 42 (1st Cir. 2011)(automobile exception applies "if there is probable cause to believe a vehicle contains evidence of criminal activity").

Here, the police had probable cause to believe the gun safe was in the car. The car in this case was of interest to the police not merely because Kennedy had been driving it before he was arrested, but because the officers were told by the Quincy police, in their communications about the gun safe larceny, that

7

Kennedy likely would be driving that specific vehicle.  There was no testimony at the hearing that the Quincy officers directly communicated the fact that the gray Honda Fit was reportedly used in the larceny, although the police report that Kennedy moved into evidence shows that the complainant in the larceny case shared that information with the Quincy Police. Rather, the testimony at the hearing was that the Honda Fit and license plate was provided as, according to Officer McManus, a "detail[] of a vehicle that Mr. Kennedy was driving" and as, according to Sergeant Albert, "information as to Mr. Kennedy's mode of transportation or vehicle he might be operating."

The information conveyed by the Quincy Police to the BPD, that Kennedy had stolen a gun safe and that he was expected to be operating a Honda Fit, was based on the information collected by the Quincy Police from the complainant in the larceny case. Because the police departments were cooperating on this matter, the fact that the BPD officers did not have direct independent knowledge of the larceny is immaterial — they were entitled to rely on all information they received from the Quincy Police under the fellow-officer/collective-knowledge rule. *United States* v. *Meade*, 110 F.3d 190, 193-94 (1st Cir. 1997)("law enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is

committing a crime."). The BPD could rely on the communicated information from the Quincy Police without regard to the fact that they are different agencies. *See, e.g., United States* v. *Capelton*, 350 F.3d 231, 2401 (1st Cir. 2003)(imputing knowledge from DEA agents to state police).

The BPD officers did not testify that the Quincy Police had actually told them that the Honda Fit was used in the larceny. It is an unsettled question in this circuit whether, for purposes of the collective-knowledge rule, information held by one officer is necessarily imputed to the acting officer simply because they are cooperating on an investigation or part of the same agency, or whether the knowledge has to vest in either the officer who directs or carries out a police action like an arrest or a search. *Meade*, 110 F.3d at 194. Although the First Circuit has held that unconveyed information possessed by different officers directly involved together in effectuating a stop can be aggregated, *U.S.* v. *Cook*, 277 F.3d 82, 86 (1st Cir. 2002), it has also expressed significant skepticism that information possessed by all individuals in a law enforcement agency or participating in an investigation can be pooled to reach probable cause. *Id.* (citing *Meade*, 110 F.3d at 194).[1] One

---

[1] For an overview of various circuit approaches to this question, *see U.S.* v. *Shareef*, 100 F.3d 1491 (10th Cir. 1996)("Other Courts of Appeals to consider this issue have allowed the knowledge of officers working closely together on a scene to be

fairly could be even more skeptical that information possessed by officers of one agency could be imputed to officers of another agency without any direct articulation of that information.

If the BPD had received no information connecting the Honda Fit to the larceny, then under the collective-knowledge doctrine as it stands in this circuit, I would not consider it to provide support for Sergeant Albert's hypothesis that evidence of the crime could still be in the car in part because the car was used as the getaway car after the theft. However, in this case, although the testimony at the hearing did not make an airtight connection between the vehicle used in the larceny and the vehicle that Kennedy was expected to be driving, the testimony made clear that the information that the Quincy Police shared with the BPD about the vehicle had a connection to the report made about the larceny, a connection that suggested that the stolen safe could be in the car. The report of the offense and the alert about the type of car Kennedy was expected to be driving based on that report together amount to probable cause

---

mutually imputed without requiring proof of actual communication . . . and even in the face of a specific finding that pertinent facts were not communicated . . . . Other courts reject the idea of imputing knowledge, even among officers working closely together . . . . And even courts that impute knowledge among officers working closely together will not do so absent a close working nexus between the officers during the stop or arrest.")

for the BPD officers to believe that the car might contain evidence of the earlier theft.

Kennedy does not dispute the government's argument that the BPD officers had information that Kennedy had been involved earlier in the larceny of the gun safe and that he had been driving the Honda Fit.  He does not challenge that the officers could fairly have believed that he had driven the car earlier at the time of the larceny.  Rather, he argues that the fact that the gray Honda Fit may have been the same vehicle he used in connection with the offense does not supply probable cause for a search.  Specifically, he argues that ten to twelve hours had passed between the time the larceny was reported and the time of his arrest,[2] so the information that would lead the officers to believe that evidence of the larceny would be found in the car was stale because Kennedy likely would have disposed of any stolen items during the intervening period.  I am skeptical that such a relatively brief period of intervening time between a larceny and a search should necessarily cause the information to be treated as stale.  However, I need not resolve whether that relatively brief lapse of time alone defeats probable cause to

---

[2]  The Quincy police report also includes information about an unidentified woman who was involved in the larceny but was not present during the arrest, suggesting that Kennedy made at least one stop after the larceny and that the safe could have gone with her.  However, there is no evidence that any information about the woman was provided to the arresting officers.

search the vehicle.  In this case, the officers' observations of the vehicle and the contents provided additional information that corroborated the information from the Quincy Police.

When considering whether information is stale for purposes of probable cause, "otherwise stale facts can be revivified and made relevant" through subsequent corroboration. *United States v. Floyd*, 740 F.3d 22, 34 (1st Cir. 2014).  In this case, the new information was the presence of a large, covered object in the backseat of the car, which Sergeant Albert believed was consistent with the size and approximate shape of a gun safe. Sergeant Albert need not have been able to see the gun safe in the back seat plainly for this additional piece of information to go into his calculation of the totality of the circumstances. The report of the larceny, the presence of Kennedy, the identification of the car the Quincy police believed Kennedy would be driving after the reported larceny, and the presence of the large, covered object in the back seat provided probable cause for a search of the car.

Moreover, as an additional justification, the BPD had probable cause to believe that the car had itself been used during the theft as the getaway car itself to remove the stolen gun safe from Quincy.  This is so, albeit from a slightly different perspective, for the same reasons that the officers had probable cause to believe that evidence of the larceny might

be in the car.  There can be no possible concern about "staleness" from this perspective because the getaway car could be seized even if the safe were no longer in it.  The fact that the police had probable cause to believe that the car was evidence of or an instrumentality of the crime, separate from anything that might have been found inside the car, allowed the police to seize the car.  *See United States* v. *Sanchez*, 612 F.3d 1, 7 (1st Cir. 2010) (police permitted to seize motorcycle and bogus plate due to probable cause to believe that they were evidence of the crime of improper licensing); *see also United States* v. *Cooper*, 949 F.2d 737, 747-48(5th Cir. 1991)("the police may seize a car from a public place without a warrant when they have probable cause to believe that the car itself is an instrument or evidence of crime").  The ability of the police to seize a car upon probable cause to believe that the car itself was used in an unlawful manner has also been addressed by the Supreme Court in *Florida* v. *White*, 526 U.S. 559 (1999), conducting the same analysis but in the context of the Florida Contraband Forfeiture Act.  There, the Court wrote that "[a]lthough . . . the police lacked probable cause to believe that respondent's car contained contraband, they certainly had probable cause to believe that the vehicle itself was contraband . . . ."  *Id.* at 564-65.  *See also Harris* v. *United States*, 390

13

U.S. 234, 235 (1968) (evidence obtained during inventory of a
car seized as evidence of crime was admissible).

Once the car was lawfully seized and in police custody, it
was subject to an inventory search, so long as the inventory
search was done pursuant to standard police procedures. *South
Dakota* v. *Opperman*, 428 U.S. 364, 372 (1976).[3] Kennedy does not
challenge the way in which the inventory search was executed
once the police determined that the car should be towed, and
there is no evidence in the record that it was conducted other
than in compliance with standard procedure.

Kennedy argues that the officers conducted the inventory
search primarily out of a desire to investigate the larceny
allegations, and to see whether the gun safe would be found in
the car.  The testimony of Sergeant Albert was that he believed
there would be evidence of the larceny inside the car: this may
suggest an investigatory motive.  But determining the existence
of probable cause to seize the car as evidence and conduct an

---

[3]  Kennedy challenged the contention that this was a seizure
pursuant to the community caretaker function of the police,
which allows the police to seize vehicles that may pose a threat
to public safety. *Opperman*, 428 U.S. at 368.  The evidence
supports Kennedy's contention that the car was legally parked
near his home, so the seizure of his car was not justified
through the general caretaking and public safety function of the
police.  As discussed above, however, the seizure of the car is
justified not by a general concern about public safety but by
probable cause to believe that the car was used in a larceny in
which ammunition was taken.

inventory search requires me to look at the objective facts, not the actors' subjective intent. *Sanchez*, 612 F.3d at 6.  Here, the objective facts show that there was probable cause to seize the car.  The combination of dual motives — both a desire to investigate as well as the desire to care properly for items in police custody through a proper inventory — does not turn an objectively valid seizure and inventory search into an improper attempt to investigate.  "That the impoundment of defendant's vehicle stemmed in part from an investigatory motive does not change either the analysis or the result.  As long as impoundment . . . is not a mere subterfuge for investigation, the coexistence of investigatory and [other] motives will not invalidate the seizure." *United States* v. *Rodriguez-Morales*, 929 F.2d 780, 787 (1st Cir. 1991).

The information provided to the BPD officers was sufficient to provide probable cause to believe that the car would contain evidence of the larceny reported from Quincy and that the car itself may have been an instrumentality of that crime.  The seizure and subsequent search of the car were therefore valid under both a probable cause and an inventory search analysis.

### III. CONCLUSION

For the reasons set forth more fully above, I DENIED the defendant's motion to suppress, Doc. No. 33.


/s/ Douglas P. Woodlock
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE